**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

UNITED STATES OF AMERICA,

v.                                                      Case No. 8:25-cr-297-KKM-TGW

JULIAN MATEO BALLESTEROS et al.,

      Defendants.

_____

## <u>ORDER</u>

Julian Mateo Ballesteros moves to dismiss a two-count indictment alleging violations of the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C. §§ 70503(a), 70506(a) and (b), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(1)(B)(ii). *See* MTD (Doc. 51). The indictment stems from the United States Coast Guard's seizure of cocaine from a sailboat occupied by Ballesteros. Indict. (Doc. 21). Ballesteros argues that the United States lacked jurisdiction over the sailboat because it flew a Polish flag, thus giving Poland "exclusive jurisdiction over the vessel" under the MDLEA. MTD at 1, 8. Additionally, and anticipating "that the government will argue it boarded the sailboat to render aid," Ballesteros says that the Coast Guard "exceeded the scope of its authority" in searching the boat. MTD at 10. Because Ballesteros lacks standing to assert either an international law or Fourth Amendment defense, I deny his motion to dismiss the indictment.

## I.    BACKGROUND

In April 2025, U.S. Coast Guard patrol aircraft detected a suspicious sailboat in international waters roughly 150 miles north of La Guajira, Colombia. U.S. Ex. 1. (Doc. 54-1); Resp. (Doc. 54) at 2. In response, the Coast Guard's Cutter Diligence launched two smaller boats to approach the sailboat, which "display[ed] a Polish (POL) Flag." U.S. Ex. 1. Upon approach, Coast Guard personnel observed Ballesteros and another crew member using buckets to remove water from the sailboat's forward compartment, which appeared to dip forward. *See id.*; Def.'s Ex. 2 (Doc. 51-2) at 2. Ballesteros identified himself as the sailboat's captain to Coast Guard personnel and requested their assistance. *See* Def.'s Ex. 1 (Doc. 51-1) at 2; Def.'s Ex. 2 at 2. Ballesteros also "made a verbal claim of Polish nationality for the vessel." Paré Decl. (Doc. 40-1) ¶ 4.

Shortly thereafter, and after receiving authorization from Coast Guard command, four members of the Cutter Diligence boarded the sailboat with a pump to remove water from the forward compartment. Def.'s Ex. 1 at 3. In Ballesteros's presence, two of the Coast Guard members—Officer Clemons and Ensign Mock—conducted an initial safety sweep of the compartment "closest to the known flooded compartment." *Id.*; *see* Def.'s Ex. 5 (Doc. 51-5) at 3. Officer Clemons claims that he asked Ballesteros "if there were any other entries to the bilge . . . to get a better angle of any potential active flooding," to which

Ballesteros then "began to remove luggage, loose clothing and a spare mattress" from the starboard bed revealing "ten packaged kilos of contraband." Def.'s Ex. 1 at 4. Ensign Mock, on the other hand, reported that he and Officer Clemons "lifted a compartment cover . . . where [they] observed what appeared to be multiple kilos of suspected contraband." Def.'s Ex. 7 (Doc. 51-7) at 4. Officer Clemons reported the discovery to the Cutter Diligence. *Id.*

From there, the Coast Guard commenced a "forms exchange via Article 17 with Poland,"[1] recognizing that it was "unlikely to hear anything tonight with [the] time difference." U.S. Ex. 2 (Doc. 54-2) at 3–4. In the meantime, the Coast Guard instructed its personnel to treat the sailboat's two crew members as search and rescue survivors. *See* Def.'s Ex. 2 at 4. At some point while awaiting further instruction, the Coast Guard boarding team observed smoke coming from a compartment recently occupied by the sailboat's second crew member, Sandro Perugorria Luna. *Id.*; Def.'s Ex. 4 (Doc. 51-4) at 4. Upon confirmation of a fire onboard the sailboat, the Coast Guard crew disembarked and transported Ballesteros and Luna to the Cutter Diligence. *See* U.S. Ex. 4 (Doc. 54-4) at 2. While attempting to extinguish the fire, Coast Guard

---

[1] Article 17 of the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances obligates the United States and other signatory nations to "co-operate to the fullest extent possible to suppress illicit traffic by sea, in conformity with the international law of the sea." *United States v. Castillo*, 899 F.3d 1208, 1213 (11th Cir. 2018) (citation modified).

personnel observed packages of contraband floating in the forward compartment. *Id.* at 3. Coast Guard personnel recovered at least four packages from the water after their firefighting efforts failed and the sailboat sank. *Id.*

On April 24, 2025, approximately one day after the Coast Guard contacted Poland and the vessel sank, Polish officials responded and confirmed the sailboat's nationality but "but did not authorize [law enforcement] boarding." Def.'s Ex. 9 (Doc. 51-9) at 2; Paré Decl. ¶¶ 5–6. Four days later, "the Government of the United States requested the Government of the Republic of Poland waive its primary right of jurisdiction over the vessel." Paré Decl. ¶ 7. Two-and-a-half weeks later, on May 16, 2025, "Poland consented to the enforcement of United States law by the United States over the vessel." *Id.* ¶ 8.

Just over one month later, the United States filed the grand jury's indictment, which alleges that "[b]eginning on an unknown date and continuing through on or about April 22, 2025, while upon the high seas and aboard a vessel subject to the jurisdiction of the United States," defendants Ballesteros and Luna "did knowingly and willfully combine, conspire, and agree . . . to possess with intent to distribute a controlled substance," Indict. at 1 (Count One), and did "possess with intent to distribute a controlled substance," cocaine, *id.* at 2 (Count Two). Ballesteros moves to dismiss the indictment in full for lack of jurisdiction, *see* MTD; Reply (Doc. 60), and

requests a hearing on the motion, (Doc. 52). The government opposes both the motion and the request for a hearing. *See* Resp. (Doc. 54).

## II.   LEGAL STANDARD

An indictment is "a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). At any time, a defendant may move to dismiss an indictment on the ground that the Court lacks jurisdiction. *See* FED. R. CRIM. P. 12(b)(2). "Under FED. R. CRIM. P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).

## III.   ANALYSIS

Ballesteros makes two arguments in support of dismissing the indictment. First, he claims that "the sailboat was not subject to the jurisdiction of the United [S]tates as it was travelling under the Polish flag," thus defeating jurisdiction under the MDLEA. MTD at 9. Second, he argues that even though the Coast Guard boarded the sailboat "to render aid," that purported "intent is belied by the facts," which indicate that "the USCG exceeded the scope of its authority by searching the sailboat." MTD at 10.

## A. This Court has jurisdiction under the MDLEA

The MDLEA makes it unlawful for an individual "on board a covered vessel" to "knowingly or intentionally" "manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1); *see also* Ryan R. Babb, Note, *Foreign Territorial Sea-Zures: Article I Supports the Application of the Maritime Drug Law Enforcement Act to Drug Trafficking Within Foreign Territorial Seas*, 74 FLA. L. REV. 345, 349–51 (2022) (describing the MDLEA and its use by the Coast Guard). The MDLEA "applies even though the act is committed outside the territorial jurisdiction of the United States," so long as the individual was aboard a "covered vessel." 46 U.S.C. § 70503(b). In turn, a "covered vessel" is defined as "a vessel of the United States or a vessel subject to the jurisdiction of the United States" or "any other vessel if the individual is a citizen of the United States or a resident alien of the United States." *Id.* § 70503(e). And, as relevant here, a "vessel subject to the jurisdiction of the United States" includes "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." *Id.* § 70502(c)(1)(C). "Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States . . . may be obtained by radio, telephone, or similar oral or electronic means . . . and *is proved*

6

*conclusively* by certification of the Secretary of State or the Secretary's designee." *Id.* § 70502(c)(2)(A)–(B) (emphasis added).

Here, the government has provided conclusive proof of Poland's consent to the United States' jurisdiction. *See* Paré Decl. ¶ 8 ("[O]n or about May 16, 2025, the Government of the Republic of Poland consented to the enforcement of United States law by the United States over the vessel"). Ballesteros does not contest the certification, but rather its timing. He agrees that the MDLEA "empowers the USCG to enforce the laws of the United States on a foreign-flagged vessel if the foreign nation consents or waives objection," MTD at 7, but says that Poland had not consented to the United States' jurisdiction when the Coast Guard searched his sailboat, *id.* at 9. According to Ballesteros, "[b]ecause the USCG did not get permission from Poland to search the sailboat," the sailboat was outside of the Coast Guard's jurisdiction "under domestic or international law." *Id.*; Reply at 3 ("[A]t the time of the interdiction and search . . . there was no subject matter jurisdiction over the sailboat."). Ballesteros's argument confuses this Court's subject matter jurisdiction and the federal government's territorial jurisdiction vis-à-vis foreign sovereigns.

### i.   Subject Matter Jurisdiction

To begin, "whether a vessel is subject to the jurisdiction of the United States is not an element of [an MDLEA] offense, but instead is solely an issue of subject matter jurisdiction that should be treated as a preliminary question

7

of law for the court's determination." *United States v. Tinoco*, 304 F.3d 1088, 1105 (11th Cir. 2002); *see United States v. De La Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008) (construing the " 'on board a vessel subject to the jurisdiction of the United States' portion of the MDLEA as a congressionally imposed limit on courts' subject matter jurisdiction"). To resolve that preliminary question in cases where the vessel's status turns on a foreign nation's claim, "Congress instructs specifically that courts should treat the MDLEA certification as conclusive of the foreign nation's response." *United States v. Hernandez*, 864 F.3d 1292, 1300 (11th Cir. 2017); *see United States v. Campbell*, 743 F.3d 802, 809 (11th Cir. 2014). Because the certification is conclusive of a foreign nation's consent under 42 U.S.C. § 70502(c)(1)(C), "[t]he exact timing of a flag nation's permission is not a condition to" jurisdiction. *United States v. Bustos-Useche*, 273 F.3d 622, 627 (5th Cir. 2001) ("A defendant may be tried for an offense under the statute if the flag nation acquiesces after a vessel is commandeered."); *United States v. Hurtado*, 89 F.4th 881, 893 (11th Cir. 2023) (holding that "flag nation consent to United States jurisdiction is valid even if given after prosecution has begun"); *United States v. Juda*, 46 F.3d 961, 966 (9th Cir. 1995) ("We have held, however, that when MDLEA jurisdiction is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent.").

Ballesteros does not—and cannot—contest Poland's after-the-fact consent to jurisdiction, which provides this Court's subject matter jurisdiction under the MDLEA. But that raises a second-order question: "How can defendants commit a crime on a vessel at a time when it is not yet determined to be [subject to the United States' jurisdiction], only to have the vessel meet the statutory requirements . . . after the crime has been committed?" *United States v. Hernandez*, 864 F.3d 1292, 1303 (11th Cir. 2017). The answer turns on the "MDLEA's jurisdictional provisions['] allocat[ion] [of] power between the courts and the executive as to which of the two will be responsible for complying with U.S. obligations under the international law of criminal jurisdiction." *Id.* at 1303–04. Under that allocation, courts need not "hold[] that the [vessel] was stateless under international law at the time of the criminal conduct," but only "that the statutory requirements for MDLEA prosecution in U.S. courts have been met, while recognizing that any further jurisdictional complaint over that U.S. prosecution is to be handled by the executive branch, nation-to-nation, in the international arena." *Id.* at 1304; *see also Tinoco*, 304 F.3d at 1108 ("[T]he jurisdictional requirement [of the MDLEA] was inserted into the statute as a diplomatic courtesy to foreign nations and as a matter of international comity in order to avoid 'friction with foreign nations.' " (quoting *United States v. Gonzalez*, 776 F.2d 931, 940 (11th Cir. 1985))). "So viewed, there is no anomaly in finding jurisdiction under the MDLEA based on a

Secretary of State certification of a vessel's state's post-crime [consent]." *Hernandez*, 864 F.2d at 1304.

Because the executive's certification of jurisdiction is conclusive, even after the fact, Ballesteros's subject matter jurisdiction attack fails.

### ii.   International Law

All that remains of Ballesteros's argument, then, is that the Coast Guard flouted international law by boarding the Polish-flagged sailboat before receiving authorization from Poland (despite Ballesteros's protestations that he challenges jurisdiction "under the domestic law"). Reply at 2. Repeatedly, Ballesteros avers that under "principle[s] of customary international law," "[t]he flag state has the exclusive legislative and enforcement rights over the vessel while on the high seas." MTD at 8; *see id.* at 7 ("Congress is bound by its international obligations or will be subject to the consequences of the violation of internation law."). These arguments, though, are not Ballesteros's to raise.

As explained above, "[i]n the MDLEA, Congress has delineated between judicial and diplomatic compliance with international law limits on criminal jurisdiction over the actions of aliens on ships on the high seas, with respect to limits on both prescriptive and enforcement jurisdiction." *Hernandez*, 864 F.3d at 1304. When the line falls on the diplomatic side, "any battle over the United States' compliance with international law in obtaining MDLEA jurisdiction should be resolved nation-to-nation in the international arena, not between

criminal defendants and the United States in the U.S. criminal justice system." *Id.* at 1302. Accordingly, "a person charged with a violation of the MDLEA 'does not have standing to raise a claim of failure to comply with international law as a basis for a defense.'" *United States v. Canario-Vilomar*, 128 F.4th 1374, 1379 (11th Cir.) (quoting 46 U.S.C. § 70505), *cert. denied sub nom. Canario-Vilomar v. United States.*, 146 S. Ct. 269 (2025). That claim "may be made only by a foreign nation" and "does not divest a court of jurisdiction." 46 U.S.C. § 70505.

Ultimately, "[i]n operating on a ship with a certain nation's flag, [Ballesteros] risk[ed] that the flag nation [would] consent to jurisdiction by another." *Hurtado*, 89 F.4th at 893. Poland did exactly that, and Poland has not withdrawn its consent or otherwise raised the Coast Guard's purported violation of international law as a defense to Ballesteros's prosecution. Because Ballesteros has no standing to do so in Poland's place, his argument fails.

### B. Ballesteros does not have standing to raise a Fourth Amendment challenge to the Coast Guard's search

Next, Ballesteros contends that the Coast Guard "had no justification under domestic or international law to board the sailboat" because the Coast Guard's purported intent to render aid is "belied by the facts." MTD at 10. Even if the Coast Guard intended to render aid, Ballesteros says it "exceeded the scope of its authority by searching the sailboat." *Id.* Although Ballesteros does

11

not mention specific constitutional protections, issues surrounding the Coast Guard's "intent" and "scope of . . . authority" to search sound in the Fourth Amendment.[2] The government responds that the Fourth Amendment does not apply to Ballesteros, and thus he has no standing to raise it as a defense to the search and seizure of contraband. *See* Resp. at 10–12. I agree.

It is undisputed that "the Fourth Amendment does not apply to searches and seizures (arrests) by the United States of a non-citizen/non-resident alien arrested in international waters or a foreign country." *United States v. Cabezas-Montano*, 949 F.3d 567, 593 (11th Cir. 2020) (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274–75 (1990) (holding that the Fourth Amendment protects only "the people" of the United States and has no application to search-and-seizure challenges where the challenger is a non-citizen/non-resident alien "with no voluntary attachment to the United States," and the area searched is located outside of the United States)) (citation modified); *see, e.g., United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (applying *Verdugo-Urquidez* and holding the district court properly

---

[2] The other sources of "domestic or international law" on which he relies are, at best, unclear. MTD at 10. To the extent that Ballesteros criticizes the Coast Guard for tracking the sailboat as a "target of interest" despite its Polish flag, he does not explain how doing so runs afoul of federal law. *See* MTD at 10; *see also* 14 U.S.C. § 522(a) ("The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States."). Lastly, insofar as Ballesteros suggests that the Coast Guard violated international law, that argument fails. *See supra*, Section III.A.ii.

dismissed the MDLEA defendant's Fourth Amendment claim regarding the Coast Guard's actions because the defendant was Chilean, not residing in the United States, and the Coast Guard's actions occurred in international waters). The Eleventh Circuit has regularly enforced this limitation on Fourth Amendment standing in international drug trafficking cases. *See, e.g.*, *United States v. Valencia-Trujillo*, 573 F.3d 1171, 1173, 1182–83 (11th Cir. 2009).

Ballesteros provides no reason to depart from this limitation here. The parties' exhibits demonstrate that the Coast Guard first encountered, boarded, and searched Ballesteros's sailboat approximately 150 nautical miles north of Colombia, outside of the United States' territory. *See, e.g.*, U.S. Ex. 1 at 2. The record and briefing also confirm that Ballesteros is a "non-citizen/non-resident alien" "with no voluntary attachment to the United States." For starters, Ballesteros insists that he was not "on board a covered vessel" under the MDLEA, which includes "any other vessel if the individual is a citizen of the United States or a resident alien of the United States." 46 U.S.C. § 70503(e)(2). That argument concedes most of the definitional requirement away. More, Ballesteros "verbally claimed Spanish nationality," U.S. Ex. 4 at 2, and has a Spanish passport, U.S. Ex. 2. at 2. Finally, Ballesteros does not contest the government's assertion that "all relevant United States law enforcement action took place against foreign nationals with no voluntary connection to the United

States." Resp. at 12. In fact, Ballesteros does not respond to the government's Fourth Amendment argument at all. *See generally* Reply.

To be sure, Ballesteros presses that the Coast Guard personnel who boarded his sailboat found cocaine by searching beyond where Ballesteros permitted them to do so. *Compare* MTD at 11 (describing Coast Guard officers "tearing apart the stateroom, lifting panels, and searching beneath" the starboard bed without consent), *with* Resp. at 10 (explaining that the Coast Guard "did limit the search to look for flooding," and that it was Ballesteros who "removed luggage, loose clothing and a spare mattress exposing a compartment below the starboard bed"). But because I conclude that Ballesteros lacks standing to assert a Fourth Amendment challenge to the search of his sailboat resulting in the discovery of cocaine, any factual dispute about the Coast Guard's "intent" to render aid, Ballesteros's consent, or the resulting search does not affect the validity of the indictment. I therefore deny Ballesteros's motion to dismiss and motion for an evidentiary hearing.

## IV. CONCLUSION

Ballesteros contends that because his sailboat flew a Polish flag, he was not on board "a vessel subject to the jurisdiction of the United States" until Poland consented to the United States' jurisdiction, which did not occur until after the Coast Guard searched the sailboat. To the extent that argument attacks this Court's statutory jurisdiction under the MDLEA, it fails in the

14

light of the government's certification of Poland's consent. To the extent it faults the Coast Guard for violating Polish sovereignty or international maritime law, the MDLEA leaves those questions to the executive branch. Additionally, Ballesteros—a noncitizen operating in international waters— cannot assert a Fourth Amendment defense to the Coast Guard's search of his sailboat.

Accordingly, defendant Julian Mateo Ballesteros's Motion to Dismiss (Doc. 51) and Motion for a Hearing (Doc. 52) are **DENIED**.

**ORDERED** in Tampa, Florida, on February 9, 2026.

Kathryn Kimball Mizelle
United States District Judge

15